## GOLDBERG v. MILLER ET AL.

(No. 2103; September 21, 1939; 93 Pac. (2d) 947)

(Rehearing Denied December 12, 1939)

486

For the defendant and appellant, there was a brief and oral argument by *John C. Pickett* of Cheyenne.

For the respondent, there was a brief and oral arguments by *Walter Q. Phelan* and *Clyde Zachman* of Cheyenne.

ILSLEY, District Judge.

This is a direct appeal from a judgment in the sum of $801.01, entered after a verdict of the jury was

returned in favor of plaintiff and respondent against the defendant and appellant, Sam Miller.

There are some twenty-three specifications of error set forth herein, but counsel for the appellant state, "It has been concluded to present only those specifications which go to the sufficiency of plaintiff's pleading and proof." Counsel waive all other alleged errors. We agree with counsel that this may be done.

Other matters at issue between plaintiff and other defendants have been disposed of in the court below and are not to be considered here.

Briefly, the pleadings disclose as follows: It is alleged in plaintiff's petition that plaintiff and Sam Miller were partners in buying and selling livestock. Plaintiff purchased 150 three-year-old steers, known as the Griffin steers, to be delivered to said co-partnership on August 15, 1937, at LaGrange, Wyoming. Thereafter, the defendant, Sam Miller, without the knowledge or consent of the plaintiff and contrary to the expressed agreement, fraudulently and deceitfully, contracted and conspired with the other defendants for the purpose of cheating and defrauding plaintiff to sell the steers for $8.10 per hundred weight, when, in truth and in fact, said steers were actually of the market value of $10.00 per hundred weight, thereby injuring the plaintiff in the sum of $1500.00, and he prays for judgment for his pro rata share of the market value of the 150 steers, estimated at $1500.00.

The defendant, Sam Miller, by his amended answer denies the allegation of co-partnership and other matters, and states his version as follows: That plaintiff and defendant, Sam Miller, were to purchase for Joe Miller and Company the 150 head of three-year-old Griffin steers at $8.00 per hundred weight and were to receive for their services the sum of ten cents per hundred weight profit for making the purchase. That a purchase agreement was entered into for the Griffin

steers in the name of Sam Miller for the benefit of the defendant, Joe Miller and Company, at eight cents per pound, the steers to be delivered at LaGrange, Wyoming, on the 15th day of August, 1937. The steers were delivered and weighed 147,190 pounds, and the defendant, Joe Miller and Company, furnished all the money. The amended answer alleges that the sum of $147.19 has not been paid to the plaintiff and defendant Sam Miller. That after the purchase of the cattle in the name of Sam Miller and at the request of Joe Miller and Company, the following written memorandum was obtained and delivered to Joe Miller and Company for the purpose of placing the original agreement in writing and completing the contract of purchase which was in the name of the defendant, Sam Miller, to-wit:

"July 12, 1937
"We have this day sold to Joe Miller and Company the J. H. Griffin and Brothers steers contract at ten cents per hundred weight profit.

(Signed) Sam Miller
Jack Goldberg."

The defendant, Sam Miller, prays that plaintiff's petition be dismissed.

Plaintiff in his reply denies these matters, as set up, and alleges that the defendants were to pay plaintiff for his services in locating and purchasing the steers at LaGrange, Wyoming, on August 15, 1937, one-half of a sum of money equivalent to one cent per pound of the aggregate weight of the said steers at LaGrange, Wyoming, on August 15, 1937. The other one-half of such sum was to go to the defendant, Sam Miller. That at such time and place, the steers weighed 147,190, and therefore, defendants were indebted to plaintiff in the sum of $1,471.90. On July 12, 1937, which is the date of the memorandum referred to in the answer, the defendant Sam Miller advised plaintiff of the sale

of certain cows purchased from J. H. Griffin and Bros. at the same time as the purchase of the Griffin three-year-old steers referred to in the pleadings and that Sam Miller presented to the plaintiff certain documents concerning the sale of the cows and represented that plaintiff's signature was necessary in connection with the sale of the cows, and plaintiff, believing the statements of Sam Miller, signed the memorandum, believing it to be a part of the transaction in regard to the sale of the cows. Plaintiff further replying states that the memorandum referred to by the defendant, Sam Miller, in his amended answer was obtained by fraud and deceit, and was a part of a conspiracy entered into between Sam Miller and Joe Miller and Company to defraud the plaintiff.

The evidence introduced on the trial shows that while the defendant Sam Miller disputes there was a partnership, it is really immaterial because if the arrangement did not constitute a partnership, at least it was a joint adventure and the relationship of coadverturers is controlled largely by the law of partnership, although the two are not identical. See Hoge v. George, 27 Wyo. 423, and Fried v. Guiberson, 30 Wyo. 150.

An analysis of the evidence shows that Goldberg and Sam Miller undoubtedly made arrangements to buy the 150 three-year-old Griffin steers with the idea of making some kind of a profit and dividing it between them. They bought the steers, entering into a written memorandum of purchase with the owners, the material portion thereof being as follows:

"July 8-1937

"Sold to Sam Miller one hundred and fifty of the best three year steers for eight cents per pound to be delivered the the fifteent day of August 1937 and weight at Lagrange Wyoming U. P. stockyards with three per cent shrink the above steers ar not to have feed or

water on the road after leaving the Preston ranch until efter the _ are weighed on arivel at U. P. stockyards Lagrange Wyoming."

The money paid on the contract was obtained by Sam Miller by drawing a draft on Joe Miller and Company of Denver, a financial arrangement by which Sam Miller frequently bought cattle. At the time the steers were purchased, Goldberg and Sam Miller also purchased of J. H. Griffin and Bros. 50 cows at $50.00 per head, and 5 cows at $30.00 per head, Sam Miller giving a draft on Joe Miller and Company in the sum of $2,650.00 in payment, and the cows were shipped two days later to another commission firm, known as Miller and Lowell Bros., and the plaintiff and Sam Miller made a profit on this sale of the cows of a sum between $500.00 and $600.00. The steers were bought July 8, 1937, to be delivered August 15, 1937.

After the making of the deal with Mr. Stewart representing J. H. Griffin and Bros., plaintiff states that he talked with Sam Miller about it and that they agreed they made a good, profitable deal. In their testimony, they refer to "cattle" when talking of prospective sales and sometimes refer to the "cows," and sometimes to the "steers." In an analysis of their testimony, it is difficult at times to tell whether they are referring to the "cows" or the "steers," or both, as embraced in the word "cattle," when that term is used.

With respect to the petition of the plaintiff, we may say that while the same may be inartificially drawn and it may state conclusions of law, however the defendant Sam Miller did not see fit to attack this pleading by a motion, or otherwise, and it has been stated by this Court:

"In the absence of a motion to have a petition made more specific, the court must construe its allegations liberally in determining whether Judgment is based

on proof of cause of action properly pleaded." Chesney v. Valley Live Stock Co., 34 Wyo. 378.

We adhere to the rule that a petition founded upon fraud or misconduct should allege with certainty and definiteness tangible facts to sustain the general averments of fraud and misconduct, and it may very well be that this petition is indefinite and uncertain in a number of important particulars, because fraud must be alleged with particularity. See Smith v. Stone, et al., 21 Wyo. 62.

At any rate, the defendant Sam Miller answered, setting up his view of the situation with respect to the purchase of the steers, and the plaintiff replied, setting up another version of the contract with respect to the purchase and sale of these steers, so that the matter at issue between these parties has, no doubt, been submitted upon issues joined, and we, therefore, conclude that the case may be decided upon the sufficiency of the evidence to sustain the verdict of the jury.

Plaintiff states in his reply that he was to receive one-half of one cent per pound of the shipping weight of the steers at LaGrange, Wyoming, which he says amounted to $1471.90. That is his second version of the transaction. In his petition, the plaintiff states that the defendant, without the knowledge or consent of the defendant, sold the steers at a price of $8.10 per hundred weight, when in truth and in fact, they were and are of the real, actual, market value in excess of $10.00 per hundred weight. That is the first story that the plaintiff Goldberg tells in his pleadings.

Throughout his testimony, the plaintiff tells a number of stories all of which seem to be at variance with one another. For instance, he testifies that Sam Miller called him on the telephone from Denver soon after the cow sale was made and told him that they made between $500.00 and $600.00 on the cows. Goldberg was

to be in Denver when the cows were sold, but for some reason failed to show up and Miller, after the phone conversation, came to Cheyenne and showed Goldberg the account of sale of the 55 cows and Miller gave Goldberg a check for $268.00, one-half the profit on the cows. At the same time, Goldberg states that Miller handed him a paper saying, "Sign this paper. I will have to send this back for record to Joe Miller and Company. They must keep a Government record how they spend their money and how they receive it back." And Goldberg stated, "And I did sign it."

Now, it must be remembered that this conversation took place on or about the 10th day of July, a couple of days after the cows were purchased. Goldberg states that after he signed the paper, Miller folded it and put it in his pocket, and Goldberg then asked him, "How about the profit on the steers?" And Miller answered, "You haven't much coming anyhow. I sold those cattle for ten cents a hundred to Joe Miller and Company, and if you don't like it, you know what you can do." Goldberg stated, "I didn't sell these cattle to Joe Miller and Company, or anybody else for $9.00 a hundred, leave alone $8.10 a hundred, not even for $9.00 a hundred."

Goldberg states on cross examination, referring to the Exhibit A, which is the memorandum referred to in the pleadings, to-wit:

"July 12, 1937.
"We have this day sold to Joe Miller and Company the J. H. Griffin and Bros. steer contract at ten cents per hundred profit.
(Signed)    Sam Miller
            Jack Goldberg."

that he signed the memorandum a little after three o'clock in the afternoon of July 12th.

Goldberg, referring to the transaction on cross examination with respect to the signing of the Exhibit A, was asked the following:

"Q   And you have alleged in your reply that he made certain representations there to get you to sign an instrument. I want you to state what those representations were.

A   He said, 'Here is your check for half of the profit on these cows,' and he handed me the account of sale.

Q   The what?

A   The account of sale on these cows, and an attached paper to this account of sale. And he says, 'You know, Jack, that they keep a record, a government record, in the Livestock Exchange Building, and as you know, my brothers are members of the Livestock Exchange.' I says, 'Yes.' He says, 'Sign this paper and I will send this paper back so that they can have it for record.'

Q   In connection with the cows?

A   In connection with the cows.

Q   But they didn't buy the cows?

A   But they paid their money out, and they got to show.

Q   You knew they didn't handle the cows?

A   But he used their money, Mr. Miller, $2,650.00, to pay for these cows.

Q   They were handled by Lowell and Miller, an entirely different firm?

A   Yes, sir."

And yet subsequently when interrogated by counsel for both parties, his testimony was as follows:

"Q   Will you state whether or not there was any writing on that paper when you signed it?

A   Not that I can recall to my knowledge, no sir, there wasn't any.

Q   It is your testimony that the written part of Defendant's Exhibit A, down to where your name appears, was not there when you signed it?

A   No sir."

"Q   You signed a blank piece of paper, did you, Jack?

A   I signed that blank piece of paper.
Q   Not a thing on it?
A   No sir."

Goldberg had no funds invested in the venture. He merely located the cattle that were to be purchased. For that matter, Sam Miller had nothing invested. Joe Miller and Company furnished all of the money at the request of Sam Miller. Goldberg states positively that he signed the Exhibit A in connection with the sale of the cows. The remainder of his testimony is devoted to the proposition that the Exhibit A was signed because of a trick or subterfuge perpetrated by Sam Miller. All of which is in direct contradiction of his previous testimony and his statements in his pleadings.

In his redirect examination, Goldberg claimed that there were two papers fastened together at the top with a clip, one being an account of sales of the cows and the other being the paper upon which he placed his signature (Exhibit A), stating that Miller said, " 'Sign here, Jack,' and that is the way he held his hand (illustrating) and I signed my name, Jack Goldberg."

Let us assume for the purposes of discussion that fraud is properly pleaded. What is shown with respect to the evidence submitted to the jury? Nothing more than a number of contradictory stories by Jack Goldberg in regard to this transaction. His statements in his pleadings are contradictory and the matters stated by him in submitting his evidence are in contradiction, one with another.

Under these circumstances, viewing the testimony with the utmost favor for the respondent, we can hardly say that the evidence is sufficient to justify the verdict in this case.

A long time ago this court said in effect that one who alleges fraud must so clearly and distinctly prove the

same as to satisfy the mind and conscience of its existence. Kahn v. Traders Ins. Co., 4 Wyo. 419.

Then too, the law will not impute fraud to any party when the facts and circumstances out of which it is supposed to arise are consistent with honesty and purity of intention. Patterson v. Lee Co., 7 Wyo. 401. The mere fact that the selling price of the steers was for a sum less than Goldberg thought was their value cannot be held to authorize a legal presumption of fraud. See Williams v. Yocum, 37 Wyo. 432; Smith v. Stone, 21 Wyo. 62.

This court has stated in many cases that where there is a substantial conflict in the evidence, a verdict or judgment on appeal will not be disturbed unless it is clearly erroneous or against the great weight of the evidence. The trier of the fact in the lower court is more familiar with what was said and how things were said in court, and is better able to judge between the different stories presented. However that may be, a conflict of testimony does not always arise merely because one witness testifies to one thing and another to something else, and the rule does not relieve an appellate court of analyzing the evidence in the light of reason and giving consideration to the motives which tend to influence or prompt human action, in an effort to solve the question as to whether the judgment is reasonably and substantially sustained by the evidence. There must be more than a conflict of mere words to constitute a conflict of evidence. The contrary evidence must be of a substantial character, such as reasonably supports the judgment as applied to the peculiar facts of the case. Montgomery Ward and Co. v. Arbogast, 81 P. (2d) 885.

Speaking of substantial conflict in the evidence, this Court has approved the rule that "the evidence, in order to raise a conflict, must be such as to present a

fair and reasonable ground for a difference of opinion. The finding or verdict must have meritorious support in the evidence. A few general statements without substantial reasons are not sufficient to raise a conflict." Wilde v. Amoretti Lodge Co., 47 Wyo. 505.

Under the circumstances, we do not think the evidence is sufficient to support the verdict. The judgment is "clearly erroneous" and against the great weight of the evidence; that there is no substantial conflict in the evidence and the judgment must be reversed with instructions to dismiss plaintiff's and respondent's cause of action against defendant and appellant, except that it is admitted by appellant that he owes respondent on account of the sale of the steers $73.60, and the district court is directed to enter judgment for that amount in favor of respondent Goldberg.

*Reversed with instructions.*

RINER, C. J., and KIMBALL, J., concur.

ON PETITION FOR REHEARING

ILSLEY, District Judge.

The petition for rehearing has been filed in this case by which counsel for plaintiff complain, in substance, that the Court erred in an analysis of the evidence in arriving at its decision herein.

In nearly every case, there are conflicts in the evidence with respect to matters that are not controlling. No doubt, there were conflicts in the evidence on non-controlling matters in this case. Because of the conflicts on non-controlling matters, counsel seem to have missed the full import of the decision in this case.

The vital, essential and controlling matter here surrounds the signing of the paper Exhibit "A", as follows:

"July 12, 1937

"We have this day sold to Joe Miller and Company the J. H. Griffin and Brothers steers contract at ten cents per hundred weight profit.

(Signed)    Sam Miller
Jack Goldberg."

It was signed—that fact is unquestioned. Was Goldberg misled into signing Exhibit "A" by fraudulent representations on the part of Sam Miller at the time Goldberg affixed his signature?

As stated in the original opinion, Goldberg testified that he signed the paper when Sam Miller told him, "You know, Jack, that they keep a record, a Government record, in the Livestock Exchange Building, and you know my brothers are members of the Livestock Exchange." To which Goldberg replied, "Yes." Then Goldberg testified that Miller said, "Sign this paper and I will send this paper back, so that they can have it for record." Goldberg admits this was said by Miller, in connection with the cow transaction.

At that time, Goldberg knew that the cows were "handled" not by Joe Miller and Company, but by another firm entirely. Why a Government record would have to be made by Joe Miller and Company concerning a transaction in which they merely loaned money to Sam Miller for the purchase of cows to be "handled" by an entirely different firm is incomprehensible.

Goldberg also testifies that the paper he signed was blank when his signature was affixed. If that be true, then it is equally incomprehensible why merely a blank sheet of paper, with the only thing on it being Goldberg's signature, was required to be sent the Livestock Exchange for record. Goldberg's testimony in this connection, as to his being deceived, was quite unworthy of credence.

In any event, it certainly falls far short of the rule that one who alleges fraud must so clearly and dis-

tinctly prove the same as to satisfy the mind and conscience of its existence. Kahn v. Traders Ins. Co., 4 Wyo. 419, 34 Pac. 1059.

The petition for rehearing is denied.

*Denied.*

RINER, C. J., and KIMBALL, J., concur.