## BROWN v. WINTERMUTE

(No. 2229; July 13, 1943; 139 Pac. (2d) 435)

For the appellant, there were briefs by *Alvin T. Clark* and *Burt Griggs,* of Buffalo, and oral argument by *Messrs. Clark* and *Griggs.*

256

For the respondent, there was a brief by *Seymour S. Bernfeld,* of Casper, and an oral argument by *Mr. Harry Schwartz.*

RINER, Justice.

A proceeding by direct appeal brings this cause here to review a judgment of the District Court of Campbell County which affirmed a decision of the State Board of Land Commissioners which had theretofore approved a decision of the Commissioner of Public Lands awarding a lease upon certain state lands to the respondent, William Wintermute, as against the conflicting application for these lands of Earl Brown, the appellant. The parties will be subsequently designated herein by their surnames or as appellant or respondent respectively.

The material facts which may appropriately be considered as shown by the record before us are substantially these: The lands involved in this litigation embrace an eighty acre tract described as the S. E. ¼ of the S. W. ¼ and the S. W. ¼ of the S. E. ¼ of Section 2, Township 42, Range 76, W. 6th P. M. in Campbell County, Wyoming. At the request of Brown the State of Wyoming applied to the Federal Government to acquire these and other lands by a "State Exchange Application." These lands and 800 acres also were patented to the State of Wyoming. Brown applied to the State to lease the entire acreage thus acquired. Wintermute filed his application to lease the eighty acre tract now in question.

The application of Brown, as presented to the Commissioner of Public Lands and the State Board of Land Commissioners, discloses that at that time he owned 30 horses, 500 beef cattle, and 1500 sheep. Wintermute

states in his application that he then was the owner of 7 horses, 50 beef cattle, and 20 sheep. Additionally, it appears from his application, that the appellant owned 19,272 acres of deeded land and leased 3,832 acres of deeded land and 3,840 acres of State School Land; the respondent stated in his application that he owned 640 acres of deeded land and leased 640 acres of privately owned land and that he held no lease to lands of the State of Wyoming. The record also shows that at the time of the trial in the District Court, both parties each actually had somewhat more livestock than the list above given would indicate.

Brown's deeded land adjoins the 80 acre tract in controversy; Wintermute's deeded land does not. But the latter's leased land held under a recorded lease for a term of years and obtained from one E. F. Maupin does adjoin that tract. Both parties desire the land for grazing purposes for their livestock. There are no improvements on this land but it appears that Brown caused a well to be drilled in July, 1938 after he had requested the State of Wyoming to obtain title to the land here involved. He equipped that well with a windmill, water storage tank, and trough for watering livestock. This well appears to be located on Brown's deeded land and is about 600 feet distant from the north boundary line of the eighty acre tract aforesaid.

It seems there is a water hole which Wintermute uses for watering livestock located on his leased land aforesaid and which one of his witnesses on the trial of the case in the District Court stated "was a practicable and useful water hole for operations the size of Wintermute's." This water hole appears to refill constantly and be useable for most of the year though at times, according to the witnesses who testified concerning it, the water sinks and is not available. It is located

about one and one-half mile from the eighty acre tract aforesaid. However, there is testimony to the effect that it is practically available to livestock using the eighty acre tract in controversy for grazing. Its dimensions, according to one of the appellant's witnesses, are ten or twelve feet wide and twenty feet long; the same witness stated that 225 sheep could water there.

Both applicants are citizens and residents of this state and have been so for many years.

In the statement of "information in conflicting applications" preceding the announcement of the decision of the Commissioner of Public Lands, it is set forth that Wintermute "states that the land he applies for has been in a fenced pasture of his for the past twelve years." This fence is marked on a plat which was a part of Wintermute's application for a lease, as is the water hole aforesaid which is designated thereon as a "spring". In a letter transmitted with his application and received by the Land Commissioner at the same time, Wintermute stated in part, "In the application I have marked a red line which did indicate a fence" * * * "This said land has been inside of this pasture for twelve years until last year."

Brown offered as rental for the lands for which he made application the sum of 5¢ per acre for the entire 880 acres, the acreage above 800 including the tract in question for which he applied. Wintermute offered 12½¢ per acre as rental for the 80 acre tract aforesaid. In connection with that portion of the printed forms of application of the two parties where provision is made for setting forth the rental offer of the applicant is the printed direction:

"IMPORTANT. If you are not the old lessee this is your final rental offer, be sure it is all you wish to pay for the land and is equal to or above the minimum rental fixed by the Board."

Below this direction and in paragraph numbered 17 appears also a printed warning reading:

"Remember that the highest offer for the use of the lands as between new applicants may govern the disposition of the lease."

As already indicated, the State Board of Land Commissioners affirmed the action of the Commissioner of Public Lands in granting a lease to Wintermute upon the 80 acre tract here involved and in granting a lease to Brown for the remaining 800 acres aforesaid. The Commissioner's ruling had fixed a rental charge of 5¢ per acre for each of these tracts. This the Board altered so as to make the charge 7½¢ per acre on each tract of land thus leased.

Brown, dissatisfied with the result before the State Board of Land Commissioners, appealed from its decision to the District Court of Campbell County under the authority granted by Section 91-306 W. R. S. 1931 which reads:

"Any party who may feel himself aggrieved by the decision of the board of land commissioners rendered in any contest proceeding held before said board, may have an appeal from such decision to the district court sitting within and for the county in which the land in controversy is situated. All persons joining in the appeal shall be joined as appellants, and all persons having interests adverse to the parties appealing, or any of them, shall be joined as appellees; and upon said appeal being perfected, said contest proceeding shall stand to be heard and for trial de novo, by said court."

The District Court aforesaid, after the trial de novo was had, declining to alter the ruling of the State Board of Land Commissioners, Brown brought the case here pursuant to Section 91-310 W. R. S. 1931 which provides:

"At the expiration of the time for the appearance of the appellees, the case is to be deemed ready for hear-

ing; and it shall be heard and tried the same in all respects as civil cases are tried in said district court; and an appeal from the judgment, finding and decree of said court shall lie to the supreme court the same in all respects as prescribed by law for appeals and proceedings in error from the district courts to the supreme court of this state."

The pertinent and controlling portions of the sections of our state law which supply the rules which when properly applied should dispose of this litigation are Section 91-113 W. R. S. 1931 where this language appears:

"The board shall lease all state lands in such manner and to such parties as shall inure to the greatest benefit and secure the greatest revenue to the state. Except as herein provided, preference shall in all cases be given to applicants who are bona fide resident citizens of the state and to firms, associations or corporations authorized to transact business in the state, having actual and necessary use for the land and holding title to lands in the vicinity of the land applied for, who offer to pay the highest annual rental for the use of the land for a term of five years * * *"

and that part of Section 91-114 which reads:

"If two or more qualified applicants shall offer the same annual rental for the same lands, and such offers are the highest offers received and are equal and above the minimum rental fixed by the board, and no preference exists in the old lessee, or if such old lessee does not exercise such preference, the board shall grant the lease to the applicant holding title to lands nearest the lands applied for. * * *"

Concerning the respective functions of the State Board of Land Commissioners and the courts of this state regarding matters of the character now before us, this court has pointed out in Miller vs. Hurley, 37 Wyo. 344, 262 Pac. 238 that:

"Nowhere in the Constitution or statutes is the Dis-

trict Court, or a judge thereof, granted power to lease state lands. Both the Constitution and the statutes repose that power in the land board. In exercising such power, the land board exercises a wide discretion. * * *"

After citing former cases decided here and reasoning that if by merely taking an appeal the discretion of the Board of Land Commissioners could be taken away and vested in the District Court, that discretion would be as a matter of fact non-existent in a contested matter, it was further said:

"In the former decisions of this court above set forth, it has been held that the discretion of the land board is a substantial thing and cannot be interfered with by the courts except in case of fraud or grave abuse, resulting in manifest wrong or injustice. Yet if appellants contention were upheld, it would be necessary to hold that the discretion of the land board, conferred on it by the constitution and statutes of this state, and heretofore recognized by the decisions of this court, is completely wiped out by an appeal. We cannot concur in such contentions, but hold that that discretion should be controlling except in the case of an illegal exercise thereof or in case of fraud or grave abuse of such discretion."

It is urged on behalf of appellant that Wintermute misrepresented to the Commissioner and the Board of Land Commissioners that the 80 acre tract aforesaid was inside Wintermute's pasture and that there was a "flowing" spring of water upon the land leased by Wintermute as described above. It would seem that these contentions are advanced in an effort to bring this case within the rule announced in the Miller vs. Hurley case supra. It should be recalled in connection with that rule that this court has recognized the principle which is generally applied by the courts that fraud "must be established by clear and convincing evidence." First National Bank of Green River vs.

Barrett, 54 Wyo. 394, 402, 93 Pac. (2d) 510; Williams vs. Yocum, 37 Wyo. 432, 443, 263 Pac. 607.

With these rules in mind, we have examined carefully the transcript of the proceedings before the Board of Land Commissioners and also the evidence submitted to the District Court of Campbell County, and we cannot perceive that the Board was misled by any statements of Wintermute's relative to the matters embraced in Brown's contentions, supra. So far as we can see, both of these contentions were very fully explained to the Board and to the District Court by both Brown and Wintermute. Indeed, the certified transcript from that body contains a statement of the Deputy Commissioner of Public Lands that "Both applicants were given an opportunity to present all the information they wished the board to have when they were present with their attorneys at the November meeting." That meeting was the one at which the board considered the conflicting claims of these parties to the land in question.

At the trial before the District Court, Wintermute stated in substance that he was present at the hearing before the Board of Land Commissioners during all of the proceedings at that hearing; that Mr. Brown and his attorney discussed quite fully before the Board the matter of this pasture and what was meant by Wintermute's fenced pasture; that some time was spent on that question before the Board; that he, Wintermute, did not at any time while before the Board attempt to assert that the fence itself was his; that he told the Board that it was not his fence; that at the time of the trial in the District Court he did not assert that this fence was his; that Wintermute's claim was restricted merely to the fact that he ran his livestock in that area exclusively in the summer time; that he has not attempted to withhold any facts from the Board.

So far as the matter of the spring of water is con-

cerned, it is evident that the water hole located on the Maupin lease held by Wintermute was what was meant. We think that that point also was gone into before the Board of Land Commissioners and the trial court sufficiently to show that there was no attempted deception on the part of Wintermute as regards either the Commissioner of Public Lands or the Land Board.

As above pointed out, the map accompanying Wintermute's application indicates a "spring" and also the location of a fence which made a pasture enclosure. Wintermute seems not to have claimed the fence was his. The water hole aforesaid appears to be kept refilled from underground sources for the most of the year to replace evaporation and use of it by livestock. We are inclined to think that the District Court correctly concluded that there had been no fraud and that the Board had not abused its discretion in this matter so that its conclusion relative to these points was manifestly wrong or unjust.

It is insisted for the appellant also that the provision in Section 91-114 quoted above to the effect that where the rental offers for the land in controversy are the same and other requirements not here in question are met, then the "Board shall grant the lease to the applicant holding title to lands nearest the lands applied for." It is now contended that the word "title" as thus used refers only to a fee title. But we do not think that this construction of the word is the one intended by the legislature in adopting the law and this, for a number of reasons among which may be mentioned:

First, if the legislature had so intended, it would have been extremely easy to have said so in language not to be mistaken. The insertion of the word "fee" before the word "title" would have instantly removed all doubt on that score.

Secondly, the word "title" in its broad sense has been

often held to cover in meaning all the lesser estates in land and not necessarily to indicate a fee interest.

In Roberts vs. Wentworth, 59 Mass. (5 Cush.) 192, Mr. Justice Wilde remarked in an opinion in which the then Chief Justice Lemuel Shaw concurred that:

"A party may have a title to property although he is not the absolute owner. If he has the actual or constructive possession of property or the right of possession, he has a title thereto, although another party may be the owner. * * *"

In Armstrong et al. vs. McGourty, 22 N. B. 29, 44, the court said that:

"In Sloan vs. Davis at page 954 in the judgment of the Court, the words are not 'where the freehold shall come in question' but 'where the title to land shall in any wise come in question,' our County Court Act says 'where the title to land is brought in question.' At page 595, of Sloan vs. Davis, 'we think it will be fairly carrying out the spirit and policy of the exception in the Act of Assembly to understand by "title to lands" any interest claimed in or right to the use of any lands.' "

The Court in Harrison vs. McCandlass, 22 Haw. 129, 131 used this language:

"Any instrument which is evidence of the exclusive right of possession of land in a party, is title; and the assertion of such raises a question of title within the meaning of the proviso to section 1662 Revised Laws denying to district courts jurisdiction in cases where 'the title to real estate shall come in question.' "

We find the Court in Haynsworth vs. Bischoff, 6 S. Car. 159, 167, saying:

"The expression 'title,' as just used, in its broadest sense, includes all rights capable of being enjoyed and secured under the law. One holding a legal title to lands is certainly included, but rights amounting to less than the full legal title are equally included within it."

In Kirschler vs. Albanesius, 13 N. J. Misc. 366, 178 Atl. 568, 571 also the Court discussed the meaning of the word "title" and had this to say on the subject:

"The question is whether the use of the word 'title' alone in the justice's court act shows that such title has reference solely to freeholds.

"A series of decisions of the courts of this state uniformly show that it does not, but that, on the contrary, it covers all claims of any quality to the possession of land, in so far as such claims to possession are distinguished from the actual physical possession of the land. * * *"

So 50 C. J. 783 says:

"However, 'title' does not necessarily mean absolute ownership, and the term may mean possession or the right of possession."

Thirdly, we note that Section 91-113, W. R. S. 1931, supra, refers to lease applicants "having actual and necessary use for the land." In the case at bar both applicants desire the land for grazing their livestock. Certainly a fee title so far as this use of the land is concerned added nothing that the owner of a lease would not have for that purpose.

We accordingly think that the word "title" in Section 91-114, hereinabove referred to, should be construed in its broad sense as delineated by the cited authorities above and that such a construction will secure the greatest benefit to the people of the commonwealth who are interested in the leasing of state lands.

Section 91-113 declares, as we have seen, that "preference shall in all cases be given to applicants" * * * "who offer to pay the highest annual rental for the use of the land for a term of five years." In this connection we recall that both applicants were warned by the printed application forms they signed and presented

to the Commissioner of Public Lands and Board of Land Commissioners that they should offer all they wished to pay for the land and that they should particularly remember that the "highest offer for the use of the lands as between new applicants may govern the disposition of the lease." As noted above, the application of appellant offered to pay 5¢ per acre as rental charge, the offer of Wintermute of the land in question being 12½¢ per acre. In view of the statute last above cited, we are unable to see any abuse of discretion on the part of the Board of Land Commissioners in making the award of leases as it did and we think that the learned trial judge was quite right in directing an affirmance of the decision of that Board.

*Affirmed.*

KIMBALL, Ch. J., and BLUME, J., concur.