H. C. HAVENS,
*Plaintiff and Respondent,*

v.

WILLIAM IRVINE,
*Defendant and Appellant.*

(No. 2258; April 10, 1945; 157 Pac. (2d) 570)

312

For the plaintiff and respondent the cause was submitted on the brief of Oscar O. Natwick of Cheyenne, Wyoming and Kline and Kline of Cheyenne, Wyoming, and oral argument by Mr. Natwick and Mr. M. A. Kline.

For the defendant and appellant the cause was submitted on the brief and also oral argument of James A. Greenwood of Cheyenne, Wyoming, and W. B. Jones of Wheatland, Wyoming.

OPINION

TIDBALL, District Judge.

This is an appeal from a judgment of the District Court of Platte County. The action was for a commission of $1,100 and interest alleged to be due plaintiff on account of a sale of defendant's ranch by plaintiff, a licensed real estate broker. The case was tried without a jury, resulting in a judgment for plaintiff as prayed. The only error assigned was that the evidence was in-

sufficient to support the judgment. Such being appellant's claim, under the rule laid down in several cases by this court, we must view the case from the standpoint of plaintiff's evidence, assuming that plaintiff's evidence is true, leaving out of consideration entirely the evidence of defendant in conflict with plaintiff's evidence, and give to plaintiff's evidence every favorable inference which may reasonably and fairly be drawn from it. Willis v. Willis, 48 Wyo. 403, 49 Pac. (2d) 670.

Plaintiff's evidence shows that late in March, 1941, defendant, William Irvine, owner of a ranch in Platte County, listed his ranch with plaintiff, H. C. Havens, a licensed real estate broker, for sale at $22,000 cash. The listing was not exclusive, that is, defendant had the right to sell it himself or let others do so, and no time limit was set on the contract. The listing of the property was made through S. W. McGinley, a salesman employed by plaintiff. The commission to be paid plaintiff if he sold the ranch was five percent, or $1,100. McGinley undertook the sale ,and through Ward Hildreth, a Torrington real estate broker ,a Mr. Von Forell was contacted and the property offered to him for $22,-000 cash. Von Forell visited the defendant's ranch on May 19th, 1941, in company of McGinley and Hildreth, and again about a week later. On the first visit McGinley told Von Forell the price was $22,000 cash. Von Forell looked over the place a time or two when McGinley was not with him as late as July. In June Von Forell asked McGinley to try to get better terms. He was willing to buy the ranch if terms could be secured that he was able to meet. Thereupon, McGinley contacted defendant and procured terms on one-half cash and the balance at six percent. Just how the balance was to be handled is not clear from the evidence. Hildreth testified that the terms were all cash or one-half cash and a short time to get a loan to take up the bal-

ance, which was "equivalent and tantamount to all cash," and he told McGinley the terms were prohibitive. McGinley conveyed this information to Von Forell by letter in June, which letter was received by Von Forell the last of June. No terms other than all cash were ever discussed when Von Forell, McGinley and defendant were together. As stated above, the prospective purchaser, Von Forell, was produced by Ward Hildreth, to whom plaintiff had sent details of the listing of defendant's ranch for the purpose of interesting Hildreth, a real estate broker, in the sale. Hildreth was plaintiff's agent in the matter. McGinley had three plats made of the ranch, sending one to Hildreth, one to George Vogler, and kept one himself. He showed the ranch to at least one other prospect besides Von Forell.

About May 19th or shortly thereafter, Von Forell told Hildreth he could not raise more than $5,000 or $6,000 cash, and could make further payments in the spring (presumably the spring of 1942). This offer of Von Forell to pay $5,000 or $6,000 in cash and the balance on time was never, so far. as plaintiff's evidence shows, communicated to defendant. In fact, Hildreth never communicated the terms offered by Von Forell to either McGinley or to the defendant. Von Forell never had any further contact concerning the place with McGinley after June. Von Forell at no time was able to raise $22,000 cash or one-half cash, and this fact was communicated to both McGinley and Hildreth. No attempt was made to interest defendant in accepting $5,000 or $6,000 cash. McGinley always told Von Forell he could not get better terms than one-half cash. Hildreth, however, contacted Von Forell off and on during the summer to keep up his interest in the place. Von Forell never had any contact with McGinley about the ranch after June 1st, when he found he could not meet the terms. Von Forell testified, as a witness for

plaintiff, that there was never a possibility of his meeting any terms offered by plaintiff or his agents, and the terms he could meet were never communicated to defendant by plaintiff or his agents.

Thus matters stood until August 27th, 1941, when defendant orally told plaintiff and his agent McGinley he was withdrawing the ranch from sale for the time being ,at least, and he also wrote a letter to that effect which was received by plaintiff on August 28th.

On August 28th defendant, through the intervention of A. S. Neeley, a rancher of Platte County and a friend of defendant, sold his ranch to Von Forell for $22,000, the terms being $2,000 cash, $3,000 February 1, 1942, $2,000 May 1, 1942, and $1,000 a year beginning February 1, 1943. Von Forell did not know until the day he bought the ranch what terms defendant would make.

Under the above circumstances, was the evidence sufficient to support a finding and judgment for plaintiff? This is a difficult question to answer. In the case of Owens v. Mt. Sts. T. & T. Co., 50 Wyo. 331, 63 Pac. (2d) 1006, this court, in an elaborate opinion by Justice Blume, said, at page 342:

"Whether or not a commission is due to a broker depends, largely upon the contract entered into between him and the owner. If he has not complied with his contract; if he has not accomplished or done what he has undertaken to do, while his authority exists, he is not, in the absence of some fault of the owner, entitled to a commission. He must fulfill, if not prevented by the owner ,the duty undertaken by him, and within the time given him, or he is not entitled to any compensation."

Further, on page 343 of the same case, it is said:

"There can be no doubt that if the parties make a special contract, one, for example, to the effect that no commission will be due unless the property in question

shall be sold for a definite price, and on definite terms, or that a definite result shall be reached, no commission will be due if those terms are not complied with, unless they are waived by the owner."

And further, in the same case, on pages 344 and 345, it is said:

"And the majority of the courts hold that where a broker is employed to sell property at a definite price and within a definite time, and the broker fails to perform his contract, and fails to complete the sale within the time given him, the owner, unless he waives the requirements as to time, may treat the contract at an end and may, after the expiration of the time limited, at least when he acts in good faith, himself sell the property to some one else, or to the customer produced by the broker, on different, or according to some of the authorities, even on the same terms as those offered through the broker."

And again, on the same page, it is said:

"The same rule has been held to apply, when the agency is for no definite time and when, before the broker has accomplished what he undertook to do, the agency is terminated in good faith, at least after the agent has been given a reasonable time to perform his services."

And again, on page 343 of this same case, it is said:

"But it must be observed that a material distinction must be drawn — applicable throughout — between cases in which no sale is made, and those in which one is actually made by the owner to the customer produced by the broker. And a waiver of the condition as to terms is readily and generally implied, where the owner proceeds to negotiate with the customer furnished by the broker and concludes a sale satisfactory to him."

The cases on this latter point are collected in notes in 43 ALR, 1104, and 44 ALR 350 (g). An examination of these cases will, we believe, disclose that no court has held that a broker is entitled to his commission where the sale is made after his agency is termin-

ated either by the express terms of the contract or by the act of the principal after the lapse of a reasonable time, where no time is specified in the contract, unless it was further found that the principal did not act in good faith or acted fraudulently, as is sometimes stated, in terminating the contract or in postponing the sale until the agency was terminated by the lapse of time specified in the contract. "Bad faith" in respect to the right of a broker to his commission has been said to arise where the owner revokes the broker's authority, or makes the sale through other means, when the broker has performed all he has undertaken or is plainly or evidently approaching success in his undertaking, or where a sale is made behind the broker's back. In another case it is said that "bad faith" means a purpose to obtain profits from the broker's exertions without payment, and exists where the employer revokes the broker's authority and makes the sale through other means when the broker has performed all he has undertaken or is plainly or evidently approaching success. Sherman vs. Briggs Realty Co., 310 Mass. 408, 38 N. E. (2d) 637, 640, and Kacavas vs. Diamond, 303 Mass. 88, 20 N. E. (2d) 936, 938. In Kellogg vs. Rhodes, 231 Ia. 1340, 4 N. W. (2d) 412, 415, it is said:

"If the principal acts in bad faith in a fraudulent attempt to avoid paying a commission to the broker who is the moving cause of the sale, the principal is held liable. It cannot be said as a matter of law, however, that appellee so acted."

For other cases holding that where the broker is to receive his commission only when he sells on certain terms fixed by the principal, he cannot recover his commission even though the principal sells to someone introduced by the broker on different terms, unless the owner acts in bad faith, see cases cited on page 1112 of 43 ALR, and on page 857 of 44 ALR, and especially

the cases of Patton, Temple & Williamson vs. Garnett, 147 Va. 1009, 133 S. E. 495; Walsh vs. Grant, 256 Mass. 555, 152 N. E. 884; Kellogg vs. Rhodes (supra); and Hodgin and Sharman vs. Palmer, 72 Colo. 331, 211 Pac. 373.

We do not think the evidence in this case was sufficient to support a finding that defendant acted in bad faith in the sale of his ranch to Von Forell. There was no evidence on the part of the plaintiff on that point except the fact that defendant withdrew the listing of his property from the plaintiff on August 27th and sold his property to Von Forell the next day at the same price at which it had been listed but on much more unfavorable terms that those on which it had been placed with the broker for sale. The contract with the broker was for no definite term and hence was for a reasonable time. We think it could not be successfully claimed that the plaintiff did not have a reasonable time to make the sale. He had five months to do that and failed to do so. The only prospect he produced was Von Forell, to whom the best terms submitted were for one-half cash and the balance at six percent for a short term. Von Forell's counter-terms of $5,000 to $6,000 cash and the balance on time were never submitted to defendant by plaintiff or his agents. At the time the contract was withdrawn on August 27th, the negotiations between the defendant and Von Forell were at a practical standstill and had been since June. It was not a case that came within the definition of bad faith contained in the Massachusetts cases above cited, where the broker had performed all he had undertaken or was plainly or evidently approaching success. No claim was made by the broker nor by anyone representing him that defendant did anything to prevent him from earning a commission on the terms upon which the property had been listed up to August 27th; and the broker's agents never, either before or after

the revocation of the listing, produced a buyer able to perform under the contract. Von Forell, plaintiff's witness, testified that on receipt of the June letter telling him he could buy for one-half cash and the balance on time, that was the end of the negotiations with Mr. McGinley regarding the place; and, further, that from the time Mr. Hildreth first brought his attention to the place in May up to August 27th, there was no time that he was able to buy it on the terms quoted; and the terms on which he notified plaintiff's agent he was able to buy were never communicated to the defendant.

The outstanding fact is that here we have always non-success on the broker's part to comply with the listing contract which had been agreed upon. The owner had waited five months for the broker to fulfill that contract. Yet at the time the termination of the authority took place, the entire business of selling the ranch was at a complete standstill. There is, we think, not a scintilla of evidence or any circumstances whatsoever in the case that disclose that the broker would have earned a commission if Irvine, the defendant, had refrained from doing what he did in terminating the former's authority.

The rule in such a situation has been concisely stated by Mr. Justice Campbell in Hodgin and Sharman vs. Palmer, 72 Colo. 331, 211 Pac. 373, 376, thus:

"The plaintiffs never succeeded in bringing the minds of the buyer and seller to an agreement of sale at the price and terms upon which sale was authorized by the owner, and there is no proof that they probably could or would have succeeded, within a reasonable time, in doing so. In the absence of such proof, the right to a commission does not accrue. That has been often decided by this court."

This court has said that fraud will not be imputed to any party when the facts and circumstances out of which it is supposed to arise are consistent with hon-

esty and purity of intention. Goldberg vs. Miller, 54 Wyo. 485, 96 Pac. (2d) 570. Also, that fraud must be established by clear and convincing evidence. Brown vs. Wintermute, 59 Wyo. 254, 139 Pac. (2d) 435. These are all well-known rules.

Again ,plaintiff's witness Von Forell, the ultimate purchaser, testified, "I did not know when I came over whether I could buy or not." He was referring to August 28th, when the sale was made to him. The formal notice of revocation of the broker's authority, which was a part of plaintiff's evidence, merely says that the authority is withdrawn "for the present time." If Irvine, the defendant, was sure he could make a sale, why say "for the present?" Evidently, all Irvine wanted was to see, after five months of fruitless waiting, what he himself could do with Neeley's help toward accomplishing a sale. If he failed, he could at any time thereafter relist the property. This conduct does not bear the badge of bad faith.

In the Owens case, to which reference has been made, on page 345 of 50 Wyo. 63 Pac. (2d) pp. 1009, 1010, are listed certain cases which, the opinion says, fall within the rule that where a broker has failed to perform according to the terms of the contract the principal may himself sell without incurring liability for a commission. In the first one, Price vs. Cocke, 23 Ga. App. 578, 99 S. E. 47, the court, writing the syllabus, says:

"Where a suit for a commission on a sale of land is based upon a contract authorizing the plaintiff to sell the land for the defendant for a fixed price per acre within a specified time, and it does not appear from the petition that the plaintiff procured a purchaser ready, able, and willing to buy at the price stipulated, or that during the life of the contract there was such interference on the part of the defendant as to prevent a sale of the property, or any secret agreement, collusion,

or mutual understanding between the defendant and the prospective buyer, while negotiations were pending, to delay the consummation of the trade until after the expiration of the contract the petition is subject to general demurrer, even though it be alleged that immedaitely after the expiration of the contract, time being of the essence, the defendant sold the property to one who had been negotiating with the plaintiff."

It was held that the trial court was correct in dismissing the petition as failing to state a cause of action. Another case there cited is Westerman vs. Peer Inv. Co., 197 Mo. App. 278, 195 S. W. 78. There the court said:

"That the defendant or the bank ultimately saw fit to sell the property for $50,000, thereby suffering a loss, after giving the plaintiff full opportunity to procure a purchaser at the price named in the contract, does not entitle plaintiff to a commission.

There is no evidence whatsoever that defendant in any wise interferred while plaintiff's contract was in force, preventing a sale in accordance with the stipulated terms, or acted otherwise than in the utmost good faith toward plaintiff. Indeed, it is clear that plaintiff, without molestation or hindrance, was allowed the full contract time in which to procure a purchaser at the agreed price, and that he wholly failed in his undertaking."

We may also add that the good faith of Irvine in revoking the contract was never in issue under the pleadings. Plaintiff claimed in his petition that he performed the contract, not that he was prevented from performing by any act of the defendant. We presume the plaintiff's theory in formulating his petition was that, the contract not being limited by its terms to any set time, and the defendant having attempted in bad faith to revoke it on August 27th, the attempt was a nullity and the contract was still in effect at the date of sale. If that was his theory, then, assuming that his claim might be pleaded in the manner he did, a point we need

not decide, we think it clear the burden was on him to prove fraud, and we think he failed to do so.

The judgment is reversed with instructions to dismiss plaintiff's action and enter a judgment for the defendant.

*Reversed.*

RINER, J., concurs.

## CONCURRING OPINION

RINER, J., (concurring)

I fully agree to all that is said in the foregoing opinion. This concurring opinion is submitted merely to deal with a matter which, as I recall, was somewhat discussed on the argument of this cause, and also to supply some supplementary authorities which additionally satisfy my mind that the views expressed by Judge Tidball are correct.

The material portion of plaintiff's pleading is as follows: After setting out that plaintiff is a real estate broker authorized to act as such under Wyoming law, it is alleged:

"That on or about March 27, 1941 Defendant employed Plaintiff to find a purchaser for certain real estate in Platte County, Wyoming described as follows: (the real property is here described) together with various leases to lands used in connection with the above described land for the price of $22,000.00 and Defendant thereupon agreed to pay for Plaintiff's services as compensation for finding a purchaser if such sale should be made, the sum of five per cent of the purchase price.

That thereafter while the employment was in full force and effect Plaintiff procured a purchaser to wit one Earl Von Forell who was ready, willing, and able to purchase the property herein described from said Defendant and who did purchase the property from

said Defendant for the price of $22,000.00. That under the terms and conditions of said contract of employment, which contract was verbal, Plaintiff was entitled to receive from said Defendant the sum of $1,100.00 as his compensation for finding such purchaser and procuring the sale of said property."

These allegations are followed by averments setting forth a demand for the claimed compensation, the refusal to pay and a prayer for judgment. Defendant's answer admitted that Von Forell purchased the property and that the price paid was $22,000.00, but denied "each and every other allegation, matter and thing" not admitted in said answer.

It may be here noted that the pleading of plaintiff varies from the contract actually proven as to the listing with the broker. This listing was for $22,000.00 *cash,* or at least one-half cash, as established by the undisputed testimony in the case of both McGinley, the plaintiff's real estate salesman who took the listing, and Irvine, the owner of the property who gave it, when their testimony is considered as an entirety on this matter as it should be.

It is suggested that defendant did not plead a revocation of the listing but relied on a general denial of plaintiff's allegations of a cause of action. However, it is to be noted that both plaintiff and defendant introduced testimony and evidence of this revocation without any objection or exception on the part of either and it was a conceded fact in the case. The consequence of this situation has been pointed out by this court in Claughton vs. Johnson, 47 Wyo. 536, 41 Pac. 2d 527, thus: Quoting from 49 C. J. 868 and 876, it is said:

"Admission of evidence without objection may aid and enlarge the pleadings, cure defects, or supply omissions thereon, and render it proper for the trial court to treat the pleadings as amended so as to conform to the proof."

Following this excerpt is the remark, "That statement has been substantially applied in a number of instances in this state."

Moreover it seems quite clear that plaintiff by introducing evidence on the point waived his right to object to this line of proof as without the pleadings. 4 C. J. 793-4 and cases cited. Regarding the right to prove revocation of authority of a broker under a general denial, authority may be found both upholding the right (Mott vs. Minor, 11 Cal. App. 774, 106 Pac. 244) and disallowing it (Mauser vs. Hurdle, 27 Colo. App. 567, 140 Pac. 479; Bradley vs. Blandin, 91 Vt. 472, 100 Atl. 920.) In the Mauser case there would appear to have been no evidence of revocation in the record.

Additionally, in this connection it may be observed that plaintiff's petition alleges that "while the employment was in *full force* and *effect* plaintiff procured a purchaser, * * * who did purchase the property," etc. It is difficult to perceive why under a denial of that allegation by the defendant the latter was not entitled to prove as decisive of one of the issues in the case a revocation of the listing, thus establishing that the plaintiff's "employment" was *not* in full force and effect at the time the sale was made. This proof was, it would seem, both competent and material to a proper decision of the lawsuit.

Von Forell, the party who finally purchased defendant's ranch, testified as a witness for the plaintiff on cross-examination, to quote the abstract of the record submitted under our rules and used by the parties hereto, in part as follows:

"After I submitted my offer of the terms I could make or would agree to to Mr. Hildreth I did not hear anything more from anyone regarding that offer I had made. I wouldn't know whether my offer was ever submitted to Mr. Irvine or anyone else. I received a letter

in June, the contents of which I have quoted in substance. I never received any other terms in writing from McGinley or any other letter. That is the only one. When those terms were given me it was $22,-000.00. I didn't have that available and I didn't do anything. *I couldn't meet the terms. We went right on haying and I didn't do anything about any place then. I never had any further contact concerning that place with Mr. McGinley. On receipt of the letter in June that was the end of the negotiations with Mr. McGinley regarding the Irvine place. I finally did purchase this Razor Bill Ranch. Mr. Neeley came to the place where we lived, and I was again interested in the purchase, and renewed my interest that resulted in the purchase. That was in August. We were pretty near through haying, just before the county fair. I had a conversation with Neely about the place. He asked me if I was interested in that place and I said I was, but I did not have sufficient money to buy it. From the time Mr. Hildreth first brought my attention to that place up to August 27 there was no time that I was able to buy that place on the terms that had been quoted to me.* \* \* \* I remember the terms of purchase recited in the contract . Those terms of purchase had never been discussed between me and Mr. Irvine or with anybody else prior to the time I came over on the 28th and made the deal. *I did not know when I came over whether I could buy or not. Mr. Neeley never stated any terms, just told me if I was interested to come over and we would try to work out a deal, and we came over and worked out a deal."*

On redirect examination he also said:

...."*And throughout the summer of 1941 until Irvine entered into the contract with me, whereby I purchased the ranch, I never had the cash to comply with the specifications that were tendered to me at that time."*

His recross examination was:

"When I contacted Mr. Bellis I wanted to find out what the loan value would be so I would know whether there was any possibility of meeting the financial arrangement. My investigation revealed that there was not a possibility of making arrangements to purchase."

I have italicized what I believe to be the significant portions of the foregoing excerpt.

A case which would appear to be very pertinent in its application to this testimony of Von Forell which has been set forth above is that of Earp vs. Cummins, 54 Pa. St. 394.

That was an action of assumpsit by the plaintiff Cummins against Earp to recover commissions for the sale of certain real estate. "There was evidence," says the report of the case, "that the real estate was in the hands of the plaintiff for sale; that he offered it to various customers by telling them of it and by advertising it in his catalogues and in the newspapers; he also had a photograph of the house in his office and a memorandum of it in his book; that Richard Young called several times at his office, and that in an interview between the plaintiff and defendant, the plaintiff told defendant he thought he could be of use to him in effecting a sale to Young." Young ultimately bought the property from the owner, Earp. The plaintiff had verdict and judgment. Reversing this judgment and awarding a new trial, the Supreme Court of Pennsylvania speaking through Chief Justice Woodward uses this language:

"Although the property was advertised by the broker, and the attention of the purchaser was first called to it in that way, yet the evidence was that he declined to purchase, and all negotiations for a sale were abandoned for several months, nor was the purchase finally made until other parties again brought the property to his notice, and then Young, the purchaser, says he bought it, not in consequence of Cummin's advertisement, but by reason of this renewed recommendation by other parties. If anybody could tell how he bought, in consequence of what cause, Young himself was the proper witness, and he swore, 'I was not influenced by Mr. Cummings at all in making this purchase. I did not know him in the transaction,' he had nothing to do with the purchase so far as I know.'

"Now a real estate broker is the agent of the vendor. There must be an employment to constitute him an agent, and his service as such, however slight, must be the efficient cause of the sale. If a mere introduction of the property to the notice of the buyer effects the sale, the broker earns his commission. An advertisement or any other service is enough if it be the immediate and efficient cause of the bargain. But if the services of the broker, whatever they be, fail to accomplish a sale, and several months after the proposed purchaser has decided not to buy, he is induced by other persons to reconsider his resolution, and then makes the purchase as the consequence of such secondary or supervening influence, the broker has no right to a commission. In a certain sense it may be true that the purchase was in consequence of the broker's advertisement; but for that, the purchaser may never have looked at the property, nor entertained a thought of buying it, but the evidence in this case shows that it was at least due to another so distinct and separate a cause, that it was a mistake to permit the broker to recover. The simple answer to his demand was, that if the evidence was believed he did not cause the sale, that is, his agency was not the immediate and efficient cause of the sale, and law regards only proximate and not remote causes."

This decision was, it may be noted, by a unanimous court.

Also analogous to the case at bar in many respects, and especially in regard to the matter of revocation of the agency to sell and time elapsing after such revocation and before sale by the owner is the case of Stedman et al. v. Richardson, 100 Ky. 79, 37 S. W. 259. There the trial court found the facts to be that:

"defendant was to pay them a commission of two per cent, upon the selling price for their services, in the event that plaintiffs procured a purchaser for said property; that the plaintiffs did find C. H. Chenault, and did show show him said property, with a view to securing him as a purchaser; that Chenault did not buy said property while it was in plaintiff's hands, but that said property was taken out of plaintiff's hands upon

their failure to make a sale of it, *and one day after it had been so withdrawn the defendant negotiated a sale of said property,* and did sell it to said Chenault at the price named in the petition. The plaintiffs found Chenault, and but for them the defendant would not have sold to him The Court finds that the defendant, and not the plaintiffs, negotiated the sale to Chenault. The plaintiffs were not the actual or moving cause of said sale. They had found the man who became the purchaser, and showed him the property; but when it was sold said property was, in good faith, out of their hands, and they were not negotiating a sale with him at the time it with withdrawn from them." (Italics supplied).

A judgment for the defendant followed.

Affirming this judgment the Court of Appeals of Kentucky, after referring to the general rule in substance as stated by 43 A. L. R. 1104, pointed out that:

"The question involved in this case is not covered by the rule stated, but it is whether, when the seller in good faith withdraws the property from the hands of the broker, and subsequently sells it to one to whom the broker has made an effort to sell, can the broker claim his commission. The brokers failed to make the sale before a rightful withdrawal of the property from their hands. It was not withdrawn for the purpose of preventing them from making their commission. The mere fact that the brokers showed the purchaser the property, and failed to consummate the sale before the withdrawal, does not entitle them to their commissions. * * * It may be said that perhaps the contract was that the sale was to be consummated only in a reasonable time. Under such a contract the rule is that the broker is entitled to a reasonable time in which to find a purchaser, after which, if he be unsuccessful, the principal may revoke the broker's authority to sell, and not incur any liability, unless it was done to avoid the payment of commissions, while availing himself of the benefits of the broker's efforts by completing the negotiations then pending. Although the seller, under such circumstances, may subsequently sell to one to whom the broker made an ineffectual effort to sell, the

rule is the same. Mechem, Ag. § 968; Sibbald v. Iron Co., 83 N. Y. 378. There is no reason why real-estate brokers should not be held to comply with the terms of their contracts, unless wrongfully prevented by their principals, before demanding their commissions. In the case at bar the withdrawal was in good faith, and when no negotiations were even pending for the sale of the property."

Confirmatory of the fact that the terms suggested by Von Forell to Hildreth as a basis on which the former might be able to purchase the ranch property of the defendant were never communicated to Irvine by plaintiff or his agents, the positive testimony of plaintiff's witness Hildreth is:

"Q. After May 5th, Mr. Hildreth, and according to your direct testimony shortly after May 18th, Mr. Von Forell had a conversation with you in which he told you what he might be able to do in the way of arranging to purchase?

A. Yes, sir.

Q. That was so much cash, and payments at a later time?

A. Yes, sir.

Q. Some payments?

A. Yes, sir.

Q. Did you ever transmit that proposition to Mr. Irvine?

A. Not personally."

The witness then at first stated that he could not recall transmitting the Von Forell proposition to anyone but afterwards said he did "contact McGinley" by conversation, finally saying :

"Q. But not Mr. Irvine?

A. No, not Mr. Irvine.

Q. So that there was no effort made on your part directly with Mr. Irvine to bring Mr. Von Forell and Mr. Irvine together on any terms that Mr. Von Forell could make?

A. Not personally between me and Mr. Irvine?"

The affirmative testimony of plaintiff's witness, McGinley on this point is:

"Q. Did you ever receive from Mr. Hildreth any terms or offer of purchase made by Mr. Von Forell?

A. No, no offers.

Q. What is that?

A. Never received any notice of offer.

Q. Did you ever receive any offer from Mr. Von Forell to purchase this property on any terms?

A. I did not.

Q. And you never communicated any terms of purchase by him to Mr. Irvine?

A. No, I never did?

It would seem clear, as pointed out in the main opinion herein that the proof utterly fails to establish a performance of the terms of the original listing. The condition to earning a commission herein was that the sale should be entirely for all or a large part in cash to be paid to Irvine. The compensation was to be earned when a customer should be obtained who would pay this price. There is no pretense that such a purchaser was found or that such a sale was made. Irvine finally entered into an altogether different sale agreement. The performance relied on by the plaintiff does not meet the requirements of the rule announced by the decisions hereinabove reviewed and cited, and succintly declared by Mr. Justice Nelson in McGavock vs. Woodlief, 61 U. S. (20 How.) 221, 15 L. Ed. 884, where he said:

"The broker must complete the sale; that is, he must find a purchaser in a situation and ready and willing to complete the purchase on the terms agreed on, before he is entitled to his commissions. Then he will be entitled to them."

I am authorized to say that Judge Tidball concurs in this opinion.

## DISSENTING OPINION

BLUME, Chief Justice.

I dissent. And I consider the main principle involved herein of such vital importance that I feel that I must not refrain from discussing this case, including the moral elements that appear herein, with an utmost candor and frankness, but I shall do so, I hope, with due deference to the legal ability and learning of my associates herein. Some of the facts are not adequately stated in the majority opinion, and I shall state them. The property involved herein was listed for sale with plaintiff, as agent or broker, in March, 1941. Defendant, the owner, wanted $20,000 cash, net to him. Upon suggestion of the agent, the price to the purchaser was fixed at $22,000, so that the agent could receive his commission of 5% out of the price over and above $20,000. Von Forell was found by the agent as a possible purchaser, and was introduced by him to the defendant. The price of $22,000 was satisfactory to Von Forell, but the terms of payment were not. Negotiations were continued between the agent and Von Forell, and a subagent of plaintiff at Torrington and Von Forell, during the spring and summer months. At least, the trial court had the right to so find. And the trial court had the further right to find that the plaintiff was the predominating cause of the sale ultimately effected. It is very doubtful that the defendant would ever have found Von Forell as a purchaser, for he was

found near Torrington, far from defendant's land, by a subagent of plaintiff. On August 26, 1941, the defendant ,through his friend Neeley, sent for Von Forell to continue the negotiations for the sale of the land. At least the court had the right to infer that defendant, before he attempted to revoke the agency, knew of the fact that Von Forell had been asked to come on his behalf and that he ratified Neeley's act. The effect would be the same, and so, for brevity's sake, I shall hereafter consider it as though defendant himself sent for Von Forell. On August 27, 1941, defendant served notice of termination of agency on the plaintiff. On August 28, 1941, defendant sold the property to Von Forell for the sum of $22,000 on easy terms.

The cases on the right of a broker to recover a commission are very numerous, and seemingly confusing, even in cases from the same state. Statements may be found in the authorities which seem to sustain almost any kind of contention which the owner, who seeks to evade the payment of a commission, might see fit to make. Hence, the facts in a particular case are important. Assuming that the rule of Owens v. Mountain States T. & T. Co., hereinafter quoted, is not broad enough to permit the plaintiff to recover herein by reason of the fact that the element of revocation is in this case, then I think the controlling question in this case is as to whether or not the agency here involved was, under the circumstances of this case, revoked in good faith. It is a universal rule that, "in order that revocation of a broker's authority may defeat his right to commissions or other compensation, it must be made in good faith, and not as a mere device to appropriate the benefit of his services and efforts and at the same time escape the payment of commissions earned or about to be earned." 12 C. J. S. 151. If the agency was not revoked in good faith in this case ,the revocation was void, and will be treated as though in force on August

28, 1941, just as plaintiff pleaded it was. 12 C. J. S. 152. I shall not enter into the discussion of any collateral questions, except as bearing on the controlling one herein. The trial court evidently held that the agency was not terminated in good faith. The judgment in favor of plaintiff implies that. The majority opinion herein holds that there was not sufficient evidence in this case to so hold. It is mentioned that the agency was revoked "for the present time," as though that might indicate good faith. But that is a strange conclusion. If it shows anything, it points directly at the intended negotiations with Von Forell, then in progress or about to occur soon, and to the intended evasion of payment of any commission if sale to Von Forell were made, and that is the very subject matter involved herein. The opinion cites Kellog v. Rhodes, 231 Iowa 1340, 4 N. W. 2d 412, 415, as holding that bad faith could not be inferred as a matter of law. I agree with that. The court also refers to Brown v. Wintermute, 54 Wyo. 254, 139 P. 2d 435, that fraud must be established by clear and convincing evidence. I do not disagree with that rule. Fraud must be shown. But it would not be possible in one case out of a thousand to show bad faith in a case of this kind except by the circumstances themselves, and if the circumstances in this case are not sufficient from which the trial court could infer bad faith, then we might as well quit talking about such a rule. What possible inference could be drawn in this case, when defendant sent for Von Forell on August 26, 1941, terminated the agency the next day, and, on the day subsequent, made the sale to the purchaser found by agent, except the fact that the agency was terminated to evade the payment of a commission? It seems to me that the conclusion of bad faith is irresistible . In any event the trial court had the right to draw that inference, and we are not justified to reverse its holding when the facts warrant it,

which they clearly did in this case. In fact, the circumstances in this case are much stronger than any which I have found to lead the trial court to the result which it reached. I have made as exhaustive investigation on this point as the short time in which to write this dissenting opinion permitted, and I think that I can say with a great deal of confidence that there is not a single case on record which sustains the holding of the majority herein in its holding on that point, under circumstances anywhere near to those in this case, and there are a number of cases which squarely hold, or indicate, the direct contrary.

In Kelly v. Marshall, 172 Pa. 488, 33 Atl. 690, a broker had not been able to get a purchaser for the property listed with him at the price asked by the owner. The owner cancelled the agency, but 11 days thereafter sold the property to the purchaser, found by the agent, for $2500 more than the purchaser had previously offered the agent. The court said: "Whether the revocation of the agency was made in good faith or was a mere subterfuge to relieve the defendant from the payment of a commission was an open question at the trial and was for the jury." In Henschel v. Sutton, 120 Kan. 260, 242 P. 1024, an agent had not effected the sale of property listed with him in June, 1923, at the price of $33,750. The property was withdrawn from the market on December 27, 1923. But in January, 1924, the owner himself sold the property for $27,000 to a purchaser sent to him by the agent, and which amount had previously been named by the agent. The court held that whether or not the agency was terminated was a question of fact, saying: "In view of the closeness of the time the offer was made and of the withdrawal of the property from sale by plaintiff and the time when the sale was effected by the other broker, for the price named by plaintiff, the matter of good faith was a most important, if not the controlling,

question in the case." This case, of course, completely refutes the holding of the majority herein that the closeness of the time between the termination of the agency and the actual sale is not sufficient evidence of bad faith. In Smith v. Anderson, 2 Idaho 537, 21 P. 412, it appears that property was listed with an agent in August, 1886, at $8000. The owner himself sold the property in May, 1887. The remaining facts appear in the opinion of the court as follows:

"The plaintiff was employed by the defendants to do a particular thing, namely, to procure a purchaser for the ranch, at the sum of $8,000, for which services he was to receive 10 per cent, upon the purchase money paid. It appears that in the month of March, 1887, the defendants revoked, or attempted to revoke, the agency of the plaintiff, and in their notice of revocation they used the following language: That the plaintiff was not to act any further as agent to procure a purchaser for said ranch, and discharged the plaintiff from their employment, and stated further that they did not desire to sell the ranch. Yet, in the face of this statement, and about a month thereafter, they consummated a sale with the very person with whom the plaintiff had negotiated, and to whom he had introduced the defendants as a purchaser. It is also fair to presume that some negotiations had preceded the actual consummation of the sale, so that it could not have been very far from the time of the revocation by the defendants of the plaintiff's agency that the negotiations were taken up by the defendants in person. Considering these facts, and considering the fact that the defendants stated in their letter of revocation that they did not desire to sell the ranch, yet, in the very teeth of that statement, proceeding to sell, and to the very person to whom the plaintiff had introduced them, it was a fair inference from the testimony that the object of the letter of revocation was an attempt to deprive the plaintiff of his commission."

In Wood v. Broderson, 12 Idaho 190, 85 P. 490, the case of Smith v. Anderson was quoted with approval, and the court said, among other things:

"Considering all the facts in this case, and the statement of the respondent that the power to sell was revoked on the 29th of September, yet in face of the statement, seven days thereafter he proceeds to sell the property to the very person whom the evidence shows was procurd by the appellant, is at least very significant."

In Warren v. Van Der Velde, 193 Mich. 164, 159 N. W. 137, it appears that property was listed with an agent· in July, 1912, to be sold for $5700. No sale having been made, the agency was cancelled on October 15, 1912. On November 23, 1912, the owner sold the property for $5500 to one Boyland, who had been introduced to the owner by the agent as a possible purchaser. It was held that whether the agency was terminated in good faith was for the jury. No other circumstances appears in the case than the closeness of the time between the termination of the agency and the sale. The court said in part:

"The testimony for the defendant, if believed, would indicate her good faith in withdrawing the land from sale and cancelling the contract of agency. But from all of the testimony and the circumstances disclosed by it ,I think the inference might be drawn that within the life of the agreement plaintiffs indirectly sold the farm, that defendant did not, in good faith withdraw the property from sale, but was ready and willing at all times to sell it for $5,500, and that the announcement that the place was not for sale and the cancellation of the contract were acts in an attempt to deprive plaintiffs of a commission. Upon the authority of Davis-Fisher Co. v. Hall, supra, and Smith v. Anderson, 2 Idaho (Hasb.) 537, 21 Pac. 412, the case should have gone to the jury."

In the case of Studt v. Leiweke (Mo.) 100 S. W. 2d 30, the syllabus is as follows:

"Evidence disclosing that owner consummated sale within less than a week after revoking broker's authority sustained finding that owner's revocation of brok-

er's authority pending sale treaty was not made in good faith."

The court said in part:

"It is obvious that the evidence amply warrants the finding that defendant's revocation of plaintiff's authority pending the sale treaty was not made in good faith. Such revocation, therefore, does not defeat plaintiff's right to his commission."

In Howard v. Street, 125 Md. 289, 93 Atl. 923, property was placed in the hands of an agent for sale on May 16, 1911. No sale having been effected, it was withdrawn from sale in October, 1911. Negotiations by the owner with the purchaser, originally furnished by the agent, were not reopened till July, 1912. I find no facts, at least important facts, other than the difference in the time between the termination of the agency and the sale, from which the jury could infer fraud. Still the court held that bad faith might be inferred by the jury. That case goes, perhaps to the extreme, but it illustrates how utterly wrong the majority opinion herein is when it holds that there was not sufficient evidence in the case to warrant the trial court in finding bad faith in terminating the agency. In a note to 88 A. L. R. 726, it is stated:

"The time element would seem to be an important matter bearing on the question of good faith. If a considerable time has elapsed after the revocation of the agency before the principal reopens negotiations with the broker's customer, the inference of bad faith in the revocation would, it seems, generally be correspondingly weakened."

The note clearly recognizes that the time element is important, and if it is only *weakened*, corresponding to the time which elapses, then the inference of bad faith must necessarily be strong when only a day's interval exists. See also Hill v. Patten (Tex. Civ. App.) 160 S. W. 1155. I shall mention the cases from Massachusetts later.

It is true that up to the time when the agency herein was revoked, the plaintiff had not been successful, but it is plain from the evidence that if defendant had given the agent the terms at which he finally sold, the agent would have been successful long before the sale was made by the owner himself. Of course, he was under no compulsion to do that. He had a right to fix his own terms and insist upon them. At the same time he had no right to appropriate the value of the services of another without compensation, and that he did appropriate it cannot be questioned. The two rules must be harmonized in some reasonable way. Not all the stress should be placed upon the right of the owner to insist upon his terms, as the majority opinion seems to do . While an owner cannot be deprived of his right to insist upon his terms of sale, he must act in good faith in aiding the consummation of the sale, when he places his property for sale in the hands of an agent. Note 88 A. L. R. 733. He has no moral right to cause the agent to chase a will o' the wisp. The claim that he has an absolute legal right to do so has long ago been exploded. 4 R. C. L. 322. And when an owner insists on terms of sale to an agent, which the prospective purchaser, found by the agent, cannot meet, when in fact the owner is willing to meet the terms of the prospective purchaser, as shown by the fact that he does meet them immediately after attempting to revoke the agency, then, having used the agent as a means to accomplish his purpose, it may well be said that the agent's failure—if such it can be called under such circumstances—is due to the fault of the owner, of which he ought not to be permitted to take advantage by depriving the agent of his commission. The owner in such case caused the broker to chase a will o' the wisp, as it were, which, as already stated, he had no moral right to do, and which could have been avoided by giving the agent the terms which in fact were acceptable. The

failure of the agent in such case is more apparent than actual. Of course, no one can blame an owner for trying, as long as he wishes, to get better terms than he is utimately willing to accept and does accept, nor can any one question his right to do so, but that should not serve as a shield to take advantage of the broker in the long run. While couched in different language, the conclusions here stated are substantially what the court meant in Warren v. Van Der Velde, supra. The basis, of course, lies in the reasons stated in 4 R. C. L. 322, quoted in Owens v. Mountain States T. & T. Co., infra. An owner's right to insist upon his terms of sale so far as the agent is concerned, should not be held so sacred as to exclude the correlative rights of the broker. The standard is that of fairness, and it is never one-sided. And in my humble opinion that standard has been wholly overlooked or disregarded in the majority opinion herein. I may add, if it is material, that defendant probably knew the terms that had been offered by Von Forell. Otherwise, the fact that he was sent for, and the fact that the sale price was $22,000, previously offered to the agent, are hard to explain.

I do not understand that the question of good faith or bad faith in terminating an agency is eliminated from a case by the mere fact that the negotiations have come to an impasse, and that the prospective purchaser has not met the exact terms fixed by the owner. That appears to be clear from Smith v. Anderson, supra, in which the price given to the agent was $8000, and the owner sold for $6000; from Warren v. Van Der Velde, supra, in which the price given to the agent was $5700, and the owner sold for $5500; from Henschel v. Sutton, supra, in which the price given to the agent was $33,-750, and the owner sold for $27,000; from Studt v. Leiweke, supra, in which the price given to the agent was $75 per acre, and the owner sold for $40 per acre. I have found no cases which are to the contrary, at

least directly to the contrary. If that were not the rule, it is clear that the question of bad faith of revocation of agency could never be made to appear in any case in which the owner himself completes a sale on terms different from those given to the agent. And it may be noted that in some of the cases cited, negotiations had been carried on by the agent for a longer period of time than in the case at bar.

The majority opinion completely ignores the foregoing cases . In it are cited Sherman v. Briggs Realty Company, 310 Mass. 408, 38 N. E. 2d 637; Kacavas v. Diamond, 303 Mass. 88, 20 N. E. 2d 936. The facts in these cases are entirely different from the facts in the case at bar, and I see no reason to differ from the result reached therein. They are cited, however, because they contain the statement that bad faith in revoking an agency cannot be said to exist when the broker is not approaching success. Of course, that rule is doubtless perfectly sound under some circumstances, for instance, when the property is entirely taken off the market. In Sherman v. Briggs Realty Company, supra, however, the court makes an exception to the rule above mentioned, and states that the question of bad faith arises when "a sale is made behind the back of a broker." That rule was also announced in the previous case of Holton v. Shepard, 291 Mass. 513, 522, 197 N.E. 460, 464. It follows the rule of Burchell v. Gowrie and Blockhouse Collieries, A. C. (1910) 614. It is perfectly plain, of course, that the defendant in this case sold the property behind the back of the plaintiff. He secretly sent for the purchaser, found by the plaintiff, on August 26, 1941, cancelled the agency on the next day, and the following day concluded the sale. So the Massachusetts cases cited in the majority opinion are not any help in support of the majority opinion herein, although it may be mentioned, that many cases from Massachusetts are harsh, and apparently harsher than

the rules adopted in most of the states. See Note 88 A. L. R. 729-732. But I doubt that even the Massachusetts Court, or the court of any other state would, under facts like those in the case at bar, hold that the owner should not as a matter of law be compelled to pay a commission. None of the cases cited in the majority opinion even tends to show that such might be the holding. The opinion, for instance, quotes from Westerman v. Peer Inv. Co., 197 Mo. App. 278, 195 S. W. 78. In that case there was a special contract that if the agent did not sell the property for a specified price within ten days the agreement should be null and void. It is needless to say that that case has no bearing herein, and is one of those cases decided under a special contract referred to in our prior decisions, and distinguished therein from other cases.

We stated in Owens v. Mountain States T. & T. Co., 50 Wyo .331, 343, 63 P. 2d 1006, as follows:

"But it must be observed that a material distinction must be drawn—applicable throughout—between cases in which no sale is made, and those in which one is actually made by the owner to the customer produced by the broker. Harris v. Owenby, 58 Okl. 667, 160 P. 596. And a waiver of the condition as to terms is readily and generally implied, where the owner proceeds to negotiate with the customer furnished by the broker and concludes a sale satisfactory to him. Note 43 A. L. R. 1104; note 15 L. R. A. N. S. 273; 44 L. R. A. 350, note g. 'If this were not so,' states 4 R. C. L. 322, 'it would be very easy for an unscrupulous person having property for sale to get all the benefits of the broker's services in bringing the property under the notice of buyers and introducing them, by the simple method of fixing the price at a figure which he knows no person would give, and the reduction of which he is prepared to accept.' * * * Hence, as stated in other cases, a broker is entitled to his commission when he produces a purchaser who buys at a price satisfactory to the owner."

The rule so stated is well established, and to be of any value, should, of course, be carried to a reasonable conclusion. If I understand the majority opinion correctly, it would seem to be conceded that the foregoing rule would apply, and plaintiff would be entitled to recover, if the agency had not been revoked, but that, since that was done, it must further appear, in order that plaintiff may recover, that the revocation has been made in bad faith. It must, of course, be conceded, as already heretofore stated, that an owner is not required to accept terms not acceptable to him, and hence he has the right to break off and terminate the negotiations with the prospective purchaser, furnished by the broker, and take the property off the market. No one denies that. But if the subsequent negotiations carried on by the principal with such prospective purchaser is reasonably continuous with, naturally arises out of, and is the result of, the negotiations previously carried on by his agent, and culminates in a sale satisfactory to the owner, showing that the property was not in fact taken off the market—all of which is true in this case—why, in fairness, should the mere one-sided, formal revocation of the agency, or the intention with which it is made, have any effect on such a situation, assuming that the rights of the owner and the correlative rights of the broker should be reasonably harmonized, without laying too great a stress on the contract? It has been held that it has none. Heaton v. Edwards, 90 Mich. 500, 51 N. W. 544; McGovern v. Bennett, 146 Mich. 558, 109 N. W. 1055. The syllabus in the Heaton case is as follows:

"Where the owner of real property which has been placed in the hands of an agent to sell on commission knows that the agent has called the attention to a prospective purchaser to the property, and is negotiating with him to effect a sale, such owner cannot cancel the agent's authority, effect the sale, and avoid the payment of the commission."

And. it was further held that the owner, in such case, is not even entitled to have the question of good or bad faith in cancelling the agency submitted to the jury. The case is a strong case involving facts very similar to those in the case at bar. If that is the law we should arrive at the same result from two different angles. I refrain from expressing any opinion on the point at this time. But it is clear that it deserves thoughtful analysis and consideration, and perhaps differentiation.

It is not likely, as already stated, that evidence of bad faith in terminating an agency can ordinarily be found except in the circumstances under which the sale is made. And if it cannot be found in the fact that, under the suspicious circumstances herein appearing, the agency is revoked in one day, and the sale by the owner is made the next day, then it cannot ordinarily be found no matter how small the difference in these times may be. Hence, if the majority opinion is right, it necessarily follows that an owner of real estate who wants to sell, need only fix his terms which no one will want to meet, and which he himself thinks will not be met—as is true in most cases—then procure a broker to use all of his efforts in getting the best terms from a prospective purchaser obtainable, find out these terms, which in most cases is not difficult, and if these appear reasonable to him, revoke the agency one minute, and the next minute sell to the prospective purchaser brought by the broker and escape the payment of a commission. If the majority of the court would shrink from going to that extreme, it necessarily follows that they are wrong in holding that the trial court could not have inferred bad faith when the sale was made the day succeeding the revocation of the agency. The difference between a minute and a day is too small in practical affairs of men in such a matter, to make any difference in the right of the trial court to draw

the inference mentioned. If they would not shrink from going to that extreme, then all that I can say is that a position is taken far too harsh to suit the conditions of life, and when that becomes known many real estate men might as well shut up shop and devote their time and attention to something else which would not leave them quite so empty-handed.

And, finally, the case at bar presents a factor peculiar to itself, which makes it ludicrous or pathetic, depending on how we look on the facts of life, that no commission should have been earned. Defendant sold the property in controversy for $2000 more than the price which he asked. That was brought about solely and exclusively through the plaintiff's agency. That cannot be and is not disputed. Yet defendant refuses to pay anything. If defendant keeps that amount, and pays nothing to plaintiff, who procured that amount for him, then I am unable to see how it can possibly escape from being an ill-gotten gain, which no court of justice should countenance.

## ON PETITION FOR REHEARING

(June 5, 1945; 159 P. 2d 366)

BLUME, C. J., dissenting.

For former opinion, see 157 P. 2d 570.

O. O. Natwick and M. A. Kline, both of Cheyenne, in support of petition for rehearing.

In support of the petition there was a brief by O. O. Natwick and M. A. Kline, both of Cheyenne, Wyoming.

## OPINION

RINER, Justice.

A petition for rehearing has been filed herein on behalf of the plaintiff and respondent. We have examined it carefully. The material contentions therein advanced were all heretofore presented by counsel through their brief filed and upon the arguments had in the cause. After mature consideration a majority of the court reached the conclusion that upon the record submitted and the law applicable thereto these contentions were mistaken and should not be upheld.

We note, however, that counsel reiterate and appear to rely on the statement that the defendant and appellant, Irvine, sent his friend Neeley to interview Von Forell concerning the purchase of Irvine's ranch. That there may be no misapprehension on this matter we quote from the abstract of the record filed in this case under our rules where the testimony of Mr. Neeley is set forth as follows:

"I know William Irvine. I have known him 15 or 16 years. I know Earl Von Forell. I have been acquainted with him since last August, 1941. I recall I met him two days before the sale of the ranch, on the, it would be the 26th (August). I met him at his ranch. I went there for the purpose of seeing what he had to say, whether he was interested in that ranch of Mr. Irvine's. *Mr. Irvine did not send me there or know I was going there. I had never discussed with Mr. Irvine the matter of going to see Mr. Von Forell.*

*"I never communicated to him any information that I was going to see him.* I had never met Von Forell up to the 26th. (Italics supplied.)

This was the testimony of a witness for the defendant, it is true, but no other witness testifies to the contrary. There appears to be nothing in the record which establishes that this testimony is either incredible or untruthful; neither is it inherently so. Neeley was told of Von Forell by a Mr. Bellis, a federal loan agency representative, and his testimony to that effect is also undisputed.

Believing that no useful purpose would be accomplished by granting a rehearing it is accordingly denied.

*Rehearing denied.*

TIDBALL, District Judge, concurs; BLUME, C. J. dissents.